May it please the Court, Frank Bottini for Appellant Lucia. We have two issues today. One is the false statements in the 2011 proxy, and the second is with respect to the 2010 proxy. I'd like to reserve two minutes for rebuttal. All right. The district court committed reversible error when it dismissed the claims related to the 2011 proxy because it employed an incorrect legal standard. The district court employed an outcome determinative test that both this circuit eschewed in Gaines v. Houghton and which is contrary to the Supreme Court's decision in the Mills v. Electric Autolite case. The district court held that no reasonable Diamond Foods shareholder could have voted against the merger had they known the allegedly true information that was omitted from the 2010 proxy. Counsel, help me with this. My understanding of Judge Alsop's ruling is that you got tripped up on your own complaint, that you are stuck with what you pled. Isn't that really what happened here? No, Your Honor. Are you trying to change your theory? No, Your Honor, because the complaint did not seek damages based on the benefits or revenues or profits that would have been realized by Diamond had the merger gone through. The complaint specifically alleged Diamond was damaged because of the fact that the acquisition of Pringles had to be canceled. But you said, forgive me, but didn't the complaint say that this merger, had it gone through, would have been beneficial? It did. Okay. It did. But we didn't seek damages again for lost opportunity costs, lost profits. We specifically alleged, if you look at excerpts of records 117 and 118, that Diamond has suffered damages due to the cancellation of the merger. But basically, you're saying that there were legal and other administrative costs that occurred as a result of the cancellation of the merger, right? Yes, very substantial ones. No, my question, I'm just saying that's your claim, right? That's the claim. It's a derivative claim. And that's a big difference, because a lot of the cases cited by Appellee are direct class claims. McKesson HBOC case was a class claim under Section 11. The plaintiffs were alleging that they had, that they as shareholders had suffered monetary damages because of the cancellation of the merger, of what happened with the merger. This is not a direct claim. This is a derivative claim saying Diamond's been damaged, and the individual defendants who, it's all conceded, committed fraud. There's no question that Mendez and Neal and the other members of the board committed fraud. Now, we don't have a fraud complaint. We have a proxy claim. It's a negligent standard. And that, to me, seems to be important to distinguish among and between the claims. We don't have a 10b-5 claim. We don't have that. We don't have the SEC proceedings. We have a proxy claim. So taking the claim with respect to the Pringles merger, basically the proxy statement is put out and it's approved. And as I hear you now, your damages are the damages incurred in the Pringles merger not going through? Exactly. Because in one of your briefs, I think it was actually a 28J letter, you seemed to indicate that some of your damages might actually be the damages paid out in settlement on some of these other claims. Is that part of your damages? Those are part of the damages in the state law claims. Are they part of your damages in your federal Section 14 claim? No. The damages, and I think the thing to look at, you have to realize when we filed the complaint, the truth hadn't all come out yet, which was one of the reasons why it was also a mistake for the district court to not give us leave to amend under the liberal standard of the federal rules. The company hadn't finished the restatement. The SEC hadn't completed its investigation. The company hadn't filed updated SEC filings to admit all the true things. So not everything was known. But what has been known, for example, if you look at the June 10, 2013 Form 10-Q that Diamond filed last year, this is while our appeal was going on, Diamond had to recognize 50 Wait a minute. Is the 10-Q part of this proceeding? It's part of what the court can take judicial notice of. Right. But that is not in front of the district court in terms of evaluating this complaint. It was not. And that's one of my thoughts. Okay. So I don't think that. Okay. But we did allege, what is part of the record was we allege in the complaint that the integration costs were expected to be $150 million. Those costs were only incurred, the company only began to incur those costs because the shareholders approved the merger pursuant to the false proxy. So those are costs and damages to Diamond as opposed to its shareholders that are directly attributable to the false proxy. Diamond never would have begun the process of integrating its business with the Pringles Division of Procter & Gamble but for the fact that the individual defendants caused Diamond to file an admittedly false, materially false proxy statement. And the point I was referring to 10-Q is those costs ended up being $51.9 million. They're estimated to be $150 million when the proxy was filed. That's in the proxy. That's part of the record. Let me go back to the standard here on the 14. You're concerned about it being outcome determinative, but I thought that both the district court here and in McKesson was quite clear that simply because something is material doesn't mean it's outcome determinative. The question is whether it's outcome relevant in order to be actionable. And that goes back to Judge Smith's question where if everyone agrees that we're talking only about the proxy, the proxy approval requested, if it's determined that in any event Pringles would be beneficial and the range of debt incurred would be, you know, A to Z, how is that outcome relevant then at the time of the proxy? That to me is the real question, not materiality, that you need to answer and that I need to understand. Yes, Your Honor. So if you look at excerpts of record 130, we explain that in detail. It comes down to this. If you're buying something, if you're the acquirer, McKesson HBOC is a situation we had target shareholders. If you're the acquirer, price is always material. Now, under this situation, Diamond's acquisition of the Pringles division was structured as a reverse Morris trust. And under that scenario, the amount of consideration that Diamond had to pay for Pringles was directly tied to Diamond's stock price. If Diamond's stock price declined below $51 a share, Diamond would have had to pay another $200 million to acquire Pringles. The consideration would have gone up from $850 million to $1.05 billion. Did the proxy statement have in effect that, you're talking about the range and the other things, wasn't that in the proxy statement that the price, that there was this price sensitive situation? Yes. But it wasn't in the proxy that the financials were false. And once the correct financial statements came out, and there was no question they were materially false, the 2010 earnings were overstated by 65%. Counsel, hopefully you can help me with this. This case involves a lot of actions in a lot of courts. You've got Delaware. You've got California. You've got a settlement, allegedly August 19, 2013, that I suppose you would concur, would include this action if it were final. Do you agree with that? Yes. And it seems to me that what's happened here is that this is kind of the tail wagging the dog, this 14 claim, because the real issues were fought out in other courts, and this is just kind of picking up and maybe trying to fit a square peg in a round hole. What do we do with this August 19, 2013 claim? I know it's not appeal. I know it's not binding. But the reality is if it goes up through the California courts and is sustained, you don't have anything, do you? This case is over. Well, it's ‑‑ If it's sustained. I know that's not a given, but just say that happened. If that happened, it's possible that the claims, all the claims would be released. I mean, certainly there were no claims asserted there in the proxy claims, and there's no ‑‑ I think there's a little bit of a question of whether the injunctive relief clause is set in reference. Where is that? Where is that status-wise? It's still on appeal. There's no final judgment. The claims are ‑‑ It's not been calendared or anything? No. Is it brief? It's recently been briefed. Fully briefed. Fully briefed. So one of the questions I have is why we wouldn't sit tight and see what happens there. So the appellee filed a motion to stay based on exactly what both Your Honors have just mentioned, and this Court denied that motion to stay months ago. We're in a different situation today than we were then. And one of the things I think that's important ‑‑ What do you mean we're in a different situation? We're in no different situation. Okay. Well, but if we ‑‑ I mean, it seems like a very odd thing that let's say, for example, that we agree with you, either that the claim can go forward or you're permitted to amend on one or more of the, you know, 2010, 2011. And so then the case is going forward in federal court, including some of the state claims, and then the California Court of Appeal gives a ruling adverse to you. I mean, to me, it just doesn't make a lot of sense that ‑‑ it may not be moot yet, but it seems to be an odd use of judicial resources to have these parallel cases going when, in fact, as you yourself noted, it may well preclude this particular claim. Right. And the reason I think that's not the case is that for two reasons. One, there's going to be a de novo review on the appeal concerning the settlement of state law claims. The trial court clearly employed an erroneous legal standard. The trial court said I don't have to make any determination that the attorney fees were reasonable. That will be a de novo review. The other thing that's important, I think, is the value of these proxy claims. Right. It doesn't make any sense to me what you just said, and that's probably because I'm not schooled in the nuances of, you know, state law. But so my question is, if you get an adverse ruling out of the State court of appeal and it doesn't go to the State supreme court, we would have had parallel proceedings going down the track in the district court, which may well have been for naught, right? Well, I don't think so, because one of the things that can be procured in the district court is an injunction ordering Diamond not to violate the proxy laws, and our supreme courts told us in the Borak case to be liberal with respect to remedies under the federal law. I had a question about that, too. It seems to me an injunction that has passed. In other words, courts don't issue, like, do not violate the law generally. In fact, some of those have been found to be too overbroad. There will be no Pringles merger, right? Right. Okay. So that's really what the proxy was for, was for this acquisition of this Pringles division. I don't see why injunctive relief wouldn't be moved. Well, we're not asking you. So the damages are being sought for the 2011, and for the 2010 proxy, we dealt with the reelection of the directors. Injunctive relief is not moved there. Mr. Blechschmidt and Mr. Zolarz, who are defendants, are still on the board. Okay. That election can be validated. Let's split these up, okay? 2011, is there any viable injunctive relief left for that year? No, and I don't think there's any being sought. It's sought damages. Okay. So that's damages. Then you go to 2010, and you have the directors, and that's a separate issue. Right. Okay. You can still get injunctive relief on that with the election of those people who are still on the board. You can get injunctive relief to order Diamond not to violate the proxy law in the future. The SEC hasn't obtained that relief. And there's clearly self-dealing on the 2010 proxy. Mr. Neal realized over $600,000 of incentive-based compensation based on the false financial results. Counsel, before you go on with that, I want to get back to one thing. My understanding, correct me if I'm wrong, is that the August 19, 2013 settlement agreement settles this case by name and by number. Is that correct? It purports to release all the claims. It purports to, yes. So basically, if that is sustained, anything, injunctive relief, anything that might flow from this case is out the window. Is that right? That's right. Well, one of the things I'd like to point out is the State Appellate Court, when it goes to review the settlement for the substance of that settlement, one of the things that will be helpful to the court of appeal is whether a valid proxy claim was stated, especially when the damages based on that proxy claim are over $50 million. But, Counsel, the reality is, whether one likes it or not, a settlement agreement was entered into, the court blessed it. It may have been wrong, but if that settlement agreement is upheld, this case is over, and any relief that might flow from this case is gone away. Well, that's right. But if the settlement is put aside, then this case should be allowed to move forward. And this case was fully briefed at the end of 2012 and has been ready for adjudication. And this Court denied the motion to stay that's based on exactly these factors that Your Honor mentioned. And I do think it would benefit to the court of appeal and the State Court to consider the fact of whether there's a Federal proxy claim pled. And that claim has exclusive jurisdiction in this Court. The proxy claim. Correct. We'll give you some rebuttal time. Can I ask one question before we finish up the questions? I'm just wondering why are the SEC registration fees and proxy solicitation fees recoverable when those they occurred before the false proxy statements? Well, they were tied because they are derived directly from the false proxy, that they wouldn't have filed those things but for the fact that they were going to be filing the proxy. You're correct. They were incurred as part of a filing antecedent to the proxy because they related to the registration of the stock. But they wouldn't have been incurred but for the fact that they were planning on filing the proxy to obtain shareholder approval. Is there a but-for argument? It's definitely directly incurred because of the proxy. It would not have been incurred but for the filing of the proxy. Thank you. Thank you, Your Honor. Good morning and may it please the Court. My name is Dean Christie and I represent the appellee and nominal defendant, Diamond Foods. I'd like to start with the state court judgment issue because this is an issue that's incredibly important to the company. This is a derivative case. It's the interests of the company that are at issue. It's not the private interests of the litigant. It's the interests of the company that are at stake here. And here, in our circumstance, after all these multiple proceedings, we've been in state court, we've been in Delaware, we've been in the district court. All the derivative claims allegedly brought on Diamond's behalf during the relevant period have been settled and resolved through that state court judgment in the final order approving the derivative settlement. Judge Kramer, when he approved that settlement, found that the settlement was in the best interests of Diamond and its stockholders. Do you agree that that judgment is not yet final? Absolutely correct, Your Honor. So the case can't be moot. Not moot per se, but what's going to happen in the state court, Mr. Mechia was the sole objector in state court. Nobody else objected. He filed 22 pages of objections. Judge Kramer had a long hearing about those objections. He overruled all the objections. As to the terms of the settlement, it's going to be reviewed in state court under an abuse of discretion standard. Why does any of that matter to us right now in the sense that it's not yet moot, we don't yet have a final judgment? So our options would be potentially to withdraw submission, wait for the state court, or to decide the case. Or maybe there's a third option and you can tell us what that might be. Correct, Your Honor. You're right. It's not yet binding on you. You're absolutely right. But there's sort of a practical issue here, which is what interest of the company is being advanced right now? Since this is a derivative case, if we go through the burden and expense and you go through all the work to make this decision, and the state court upholds the settlement, if that happens, anything you decide is academic. It's like an advisory opinion that didn't have any impact anywhere. So you're right. It's not yet binding, but it's sensible. And I think when the court's looking at its own docket, that sensibility and the interest of the company are advanced. Do you have any projection in terms of the timing, potential timing for resolution of the state case, given where the briefing is at this stage? So we called the first appellate district's clerk just to find out what they thought about that. And they told us that we should anticipate hearing argument in September or October, so in the early fall. In the overall scheme of things in appeals, that isn't all that long. And there's going to be no prejudice to the company's interests in waiting. Nothing bad is going to happen. This is a claim that's brought on the company's behalf. So we submit that essentially in the interest of the company and in the interest of the court to wait until that time. Let me be sure I understand this. As I understand the California appellate system, under the 90-day rule, if it's heard in September, you will have a decision by the end of the year or they don't get paid. Is that right? Correct, Your Honor. I was going to add that. So they have an incentive. Unless they make an addendum for it being highly complex and difficult or whatever the case may be. Fair enough, yes. But there is that 90-day provision. So we will be done this year certainly with knowing whether that judgment is final. With that, let me turn quickly to the Pringles proxy, which is the 2011 proxy. And I'm going to start with kind of a simple proposition, which is the plaintiff hasn't really alleged or cited any case ever in 80 years since the 34 Act has been enacted, holding that where a transaction is alleged to be beneficial, and you're right, Your Honor, that's what he pled, where it's alleged to be beneficial, that the proxy can be materially misleading or actionable. There isn't one. There isn't one anywhere. They haven't cited one. We've looked for one. It doesn't exist. It's sort of like claiming that the shareholder should have approved the transaction, but you tricked them by not telling them one more reason why they should have approved the transaction. That's kind of the essence of the case. No, I think it's – I hear his essence being like the flip side of it. Here's one more reason you shouldn't have approved the transaction, one that you didn't actually get to know about. That's what he wishes he would have pled, Your Honor, but that's not what he pled. Well, that's a separate question, so I'm not sure he pled that. Right. He didn't. But when you think about it, Your Honor – I guess he would say, well, give me a chance. But would that be inconsistent with the first round? It's not only inconsistent, it's implausible. And here's why, Your Honor. And you have to think about Iqbal and Twombly and what the district court did here. So if the plaintiff's theory is right, the financial statements in our proxy were higher than – showed better results than what the reality was. That's the allegation. He indeed argues – it's not quite correct, by the way, but he says all earnings would have been wiped out. He'd have had no earnings in those relevant years if the financial statements in the proxy were correct. That's the theory. That's the plea theory. That's the argument theory in this court. Well, keep in mind, what is this transaction? Under the transaction, Pringles and Diamond were being combined such that about 60 percent – by Pringles shareholders, by the P&G shareholders. Our shareholders, Diamond's shareholders, were minority interests. So you can – he likes to call it Diamond acquiring Pringles. From an economic perspective, it's Pringles acquiring Diamond. So in that scenario, what he's postulating is this, that a shareholder of Diamond would rather own 100 percent – 100 percent of a company with no earnings – that's the theory – as opposed to being a 43 percent owner of a profitable combined company. And not only did he not plead that theory, but it would be a theory that would be contrary to the self-interest of the stockholders. No reasonable stockholder is going to want to own a company that isn't profitable when they could be part of a bigger company that is profitable. The theory doesn't hold up. And Iqbal and Twombly and Judge Alsup's opinion are all perfectly consistent in that respect. Now, I want to talk about a couple of other issues. And so his materiality point, the point that Judge Alsup really made, was that context matters. And under Mills, under TSC Industries, under Virginia Bank Shares, the three big Supreme Court cases, what they say is that the misstatement has to have a, quote, significant propensity to affect the voting process. That's what they said. And what Judge Alsup reasonably said, applying his experience and common sense, as Iqbal tells him he should do, he said, well, no reasonable shareholder is going to be less supportive of this deal given this reality. And it made perfect sense. Well, let me ask a question about that. If I'm a stockholder and all of a sudden there's about $60 million in debts that I learn about, why wouldn't I be disinclined to vote in favor of the merger? You wouldn't be disinclined to vote in favor of the merger. You would be more inclined to vote in favor of the merger. And that's HBOC-McKesson. There's two aspects to the McKesson case that Judge White decided. One was a claim brought on behalf of the HBOC shareholders. Then there was another claim brought on behalf of the McKesson shareholders. The relevant part of the opinion is the HBOC portion. There what Judge White said was, well, geez, HBOC inflated its financial results to the tune of $327 million. That wound up being in the proxy. But HBOC shareholders have no claim based on that. HBOC wasn't injured because if that information had been accurately reported, HBOC shareholders would have been even more supportive of the deal, not less. In other words, we want to dump our company as soon as we can and join up with the profitable entity. Yeah, the deal's better. Right. The deal's even better. Now, a couple of other things, and I want to emphasize the loss causation point, too, and I want to address this integration cost question that they've raised. Okay. So loss causation. That's an element of the claim. Ninth Circuit says so in the Jobs case. And here, and what Jobs says is loss causation connects the proxy misstatement with the actual economic loss suffered. In this case, loss suffered by the company. In our case, the misleading proxy did not lead to the loss of the Pringles deal, but walnut accounting did. The proxy is irrelevant to that. And so they try to slip in this argument that, well, you incurred integration costs only, they say, only because the shareholders voted yes on the approval of issuing more shares that we would have needed for the proxy deal. But that's completely undermined. It's not only false, but it's completely undermined by what they allege in their own complaint. And I would direct the court to ER 95 and 96, where in the body of the complaint they cite press releases, one from September of 2011 before the proxy, another one from June of 2011, even earlier before the proxy, and both address the fact that the company was already incurring integration costs associated with the Pringles transaction. And I'm just quoting their complaint. Their complaint at ER 96 says, quote, significant progress on Pringles integration activities included go-to-market planning, et cetera, et cetera. It's in their complaint. It didn't happen because the shareholders voted that in the event the deal could close, you could issue more shares. It happened because those expenses were being incurred immediately after the transaction occurred. And you don't have to take my word for it. It's in his complaint. As a matter of fact, the no proxy would have been required, but for the rather full development of the potential merger in the first place, right? There would be no point in it. Correct. Nobody would have voted if there hadn't been a potential deal. Correct, Your Honor. I remember what they voted on is not should we have a Pringles deal. What they voted on was we'll issue 29.1 million shares of our stock if there's a deal. That 29.1 million shares were never issued. That's what the shareholders, that's what they directly authorized. And that goes to the essential link element as well. The essential link element turns on what did the shareholders directly authorize here. They directly authorized the issuance of shares that were never issued. The company wasn't harmed by the approval of the issuance of shares that were never issued. It's kind of self-evident. So what we're suggesting here, Your Honor. It is an odd case, too. It is. Because the transaction doesn't go through. So there's no successful transaction then that gets benchmarked against this range of percentages of acquisition of debt, for example. Do you have any other cases that are like that? Sure, Your Honor. And if you look at them, we cited some of them in our brief. If you look at, among others, the Elfenbein case, which is a Southern District of New York case. It's very similar to McKesson. It was affirmed by the Second Circuit. If you look at the Bond Opportunity Fund case, likewise. And if you look at then-Chief Judge Winter's opinion of the Second Circuit in the Minzer case, which also held in somewhat similar circumstances, it's not quite a financial question, but he kind of goes through the exact reasoning that you'd want to see a court employee reconciling the Supreme Court opinions alike and saying that when the transaction doesn't go through, you just don't have this kind of claim. Do you have a Ninth Circuit case? Not a Ninth Circuit case directly on that point, no, Your Honor. But the teachings that and the arguments we're making are very consistent with the Segador, which is the Ninth Circuit, as well as the jobs case, the New York City Employees Requirement Fund versus jobs. Let me turn very quickly to the 2010 proxy, if I may, because I think this is pretty important. So there's no specific transaction subject to the 2010 proxy. The law is very clear and undisputed that the mere re-election of directors who allegedly mismanaged the affairs of the company, that's not enough to get a 14A claim. And what the plaintiff is trying to argue on the appeal is that they fit in this very narrow exception recognized in Gaines v. Houghton, the Ninth Circuit case. And what Gaines said or what he indicated is that where a shareholder is seeking equitable relief, either an injunction against a shareholder vote or a director election or seeking to set aside that director election, he can have a claim if and only if he presents a colorable claim of undisclosed self-dealing on the part of the director. That's what Gaines teaches. That's the narrow exception. So let's start with the first problem. Are they really seeking equitable relief here? Well, here's what the record says. Paragraph 108 of the complaint, ER 117, the company has suffered damages as a result of the 2010 proxy statement. Consolidated complaint paragraph 19, the case is for damages. The count, the proxy count itself, paragraph 166, seeks damages, no mention of equitable relief. And here's what they told Judge Alsup. We were before Judge Alsup on February 16th of 2012. It's at SER 444. And this is how they described their case. Quote, our case is brought, obviously, obviously, on behalf of the shareholders of the company to recover damages for diamond. The only reference anywhere, anywhere to injunctive relief in their complaint is in the prayer for relief. And it has sort of an odd formulation. It's at ER 144 where it says they want money damages, but they'll take equitable or injunctive relief, quote, to the extent that the company is unable to obtain from such defendants an adequate remedy at law. I've never seen that formulation, but it's certainly not directly linked to the 2010 proxy, and there's a really good reason for that. The really good reason is there is no kind of equitable relief that can be awarded now as to the 2010 proxy. Why? This case isn't about a four-year-old election of directors. Mr. Neal, there's no allegation to the contrary, no argument to the contrary. He's not on the board. SER 367 shows that he resigned in March of 2012. No argument that Mr. Gilbert, an outside director who was elected under the 2010 proxy, is on the board. He's left on November 14th of 2012. And while Mr. Blechschmidt and Mr. Zollers are still on the board, they were elected pursuant to subsequent annual meetings, including one earlier this year. So there's no effective injunctive relief either being sought or that could be awarded in connection with the 2010 proxy. So, again, from your perspective, and like the other from Judge Alsop's perspective, the plaintiffs are tripped up by their own complaint. Correct, Your Honor. Absolutely correct. Well, in this one, it's more of a legal question of whether where you don't have a transaction, whether this is the right kind of complaint. It may well be a mismanagement, breach of fiduciary duty complaint. Correct, Your Honor. And that was kind of our point. But those were the various other complaints that are included. Correct. It's his state law counts. It's his Delaware case. Which, by the way, has also been dismissed with a final judgment entered. And it's what was pending before Judge Kramer, which resulted in the settlement. Did the Kramer settlement involve the 10B5 claims or not? No. The class action claims were excluded from that, and those were settled separately. Okay. So sort of the last piece of Diamond Foods litigation is kind of this and the State Court appeal. Okay. I would add there also is no credible allegation of self-dealing in this complaint. That was another finding Judge Alsup made with respect to the 2010 proxy. And while I won't belabor what was in the briefs, keep in mind who these ñ who they're challenging. Mr. Zoller's is an outside director. He's not mentioned as engaging in any self-dealing. The act of self-dealing attributed to Mr. Blechschmidt is that he was on the audit committee. That's not an act of self-dealing. As to Mr. Gilbert, even ignoring that he's no longer on the board, the allegation is he received walnut payments. Well, he did. Those are fully disclosed. There's no allegation he has anything to do with the accounting for walnut payments. He sells walnuts. He got paid. There's no doubt that the information is accurate. And as to Mr. Neal, there's no allegation that his compensation isn't fully disclosed. It's there. What they want to say is he would have been paid a little less in the event that the company's accounting had been correct. Well, fair enough. But the accounting isn't a determination that's subject to the 2010 proxy. And moreover, not only is Mr. Neal not on the board, but as part of the state court settlement, he's repaid all of those bonuses. There's nothing left to do. Do you agree that the August 19th, 2013 settlement agreement, if upheld, would completely obliterate anything that might come from this case? Absolutely. I mean, Matsushita sold wholes, and that's absolutely the case in the plan. Thank you. Thank you, Your Honor. If you could put another minute on there, because he took a little extra time. So I'd like to give Mr. Bettini some extra time. Three. Why don't we put three on there, please? I'd like to start with the 2010 proxy. Judge McKeown, you asked a question about whether that really raised issues of breach of fiduciary duty. That's not the case. You have to look at the Ninth Circuit's decision in Gaines v. Houghton. And they say there that when you're dealing with an election of directors, it's a different test. It's not a causation test. It's a materiality test. They adopted the Second Circuit's formulation of the test from the Maldonado v. Flynn case and said if there's self-dealing that's alleged by the directors, it's presumptively material, and he has stated a claim. But to get back to the point that was discussed earlier, where in the complaint is self-dealing alleged? It's alleged at ER 68, at ER 136, at ER 29. Okay, ER, excerpts of record 68. Defendant Neal received additional compensation because of the improper accounting. But Judge Alsop, I thought, went through and found that what had happened, at least what he had before him, showed that, yeah, you say that, but the reality is he's either not on the board or he didn't get something that made it so, as far as he was concerned, it was not material. This was just a fly spec, if anything. If that's a correct understanding, doesn't that completely undercut the 2010 claim? No. The district court committed a reversible error by employing the wrong legal standard. He didn't file the test from the Gaines v. Haughton test of the Ninth Circuit, and he ignored the well-plaid allegations of the complaint. Again, the excerpts of records that I mentioned, ER 136, we specifically allege that Neal received excessive and unwarranted incentive compensation. Do you think that the complaint met Iqbal and Twombly standards? Yes. Yes, this is a completely plausible theory. In fact, Judge Alsop, when he denied the motion to dismiss in the 10b-5 case, he had both cases. In our case, he had the 10b-5 case. And we asked this Court to take judicial notice of that order. He said the entire motivation for the fraud was to complete the acquisition of Pringles before the fraud was revealed. And he specifically noted that he said that's a plausible theory. It's equally plausible as the countervailing theory under Twombly. He said, look what happened. And we have this in our complaint also. The original integration costs, this is a key thing. The original integration costs, when they first came out with this, were supposed to be $100 million. Then they upped it to $150 million. He said, oh, gee, coincidentally, that's pretty close. The extra $50 million is pretty close to the $60 million of the costs that they didn't recognize to keep their earnings per share up so high so they could complete the merger. That's interesting. That's a plausible theory. And then Neal got paid another $687,000 and $680,043. We allege that in our complaint. Because of the inflated earnings. So we allege self-dealing. So we've stated a claim. Turn off the cell phone, please. Turn off all cell phones. I'm sorry, you can continue. Thank you, Your Honor. So we've alleged self-dealing. The 2010 proxy states a claim under the Ninth Circuit's applicable test in Gaines v. Houghton. Now, with respect to the 2011 proxy, the standard is again Gaines and it's again the Mills case. If you allege a material misstatement or omission in a proxy when you're dealing with a merger, then causation is presumed. That's a different test than just an election of directors. So under Mills and under Gaines, the 2011 proxy, we've stated a claim because there was clearly a materially false statement in the proxy. The 2010 earnings were overstated by over 64 percent and the 2011 earnings by 89 percent. Again, as they said, it would have wiped out the earnings. And it comes down to this, a plausible theory. Shareholders care about price. Shareholders care about debt. Would you rather be Germany or would you rather be Spain or Italy? The companies that keep their debt low prosper. The companies that take on excessive debt, they're going to be harmed. And the proxy, by the way, mentions this. But the key thing is that the shareholders didn't know that the accounting was wrong. If the accounting was completely fraudulent, again, they would have had to pay another $200 million, and that would have been important to them in considering whether to approve the acquisition of Pringles. And because they approved it, there's no question that Diamond solicited shareholder approval and got it. And only because they got it did they incur these integration costs and other expenses, over $50 million. Thank you. We've given you an extra two minutes in addition. So I think we have your argument well in mind. Thank both of you for your arguments this morning. The case is argued. The Casilla v. Mendez is submitted. Thank you, Your Honors. Thank you.
judges: Nelson, McKeown, Smith